# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**FRANCISCO DELGADILLO-PEREZ,**

        **Plaintiff,**

  **v.**                               **Case No. 20-CV-021**

**JOHN BRETZEL** *et al.*,

        **Defendants.**

---

## DECISION AND ORDER

---

Plaintiff Francisco Delgadillo-Perez, who is incarcerated and represented by counsel, brings this lawsuit under 42 U.S.C. § 1983. Delgadillo-Perez was allowed to proceed on Eighth Amendment claims against Correctional Officer John Bretzel, Lieutenant Ryan Hintz, and Nurse Jennifer Kacyon for deliberately acting indifferently to the fact that Delgadillo-Perez ingested the wrong medication. The defendants filed a motion for summary judgment, which is ready for resolution. (ECF No. 30) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 7, 26.)

## PRELIMINARY MATTERS

In their reply the defendants argue that Delgadillo-Perez responded to several of their proposed findings of facts, "no dispute", but then included additional information that is nonresponsive, unnecessary, and irrelevant.[1] The defendants request that the court strike the additional information as an attempt to include facts without complying

---

[1] Specifically, the following responses to defendant's proposed findings of fact: ECF No. 65, ¶¶ 1, 3, 9, 12, 22, 42, 44, 50-51, 57, 61, 64, 72-73, 77, 85-87, 89-90, and 93.

with Civil Local Rule 56(B)(2)(b)(ii), which requires that parties submit additional proposed findings of fact in separately enumerated paragraphs in order to allow for a reply. Delgadillo-Perez did follow this rule for several proposed facts, *see* ECF No. 65, ¶¶ 101-107.

Much of the extraneous information included in Delgadillo-Perez's response appears to merely provide context and does not serve to create issues of fact. As such, the court will largely disregard the additional information. As shown below, it does not impact the outcome of the pending motion. To the extent the court considers any of the additional information, it is only because it provides necessary and non-dispositive context.

## FACTS

At all times relevant Delgadillo-Perez was incarcerated at Waupun Correctional Institution. (ECF No. 32, ¶ 1.) On August 14, 2019, defendant Bretzel was responsible for distributing medication to the North-West Cell Hall during the second shift. (*Id.*, ¶¶ 30, 32.) Typically, medication at Waupun is distributed using the Electronic Medical Records (EMR) system, which requires that a prisoner's ID and medication card is scanned before distributing medication. (*Id.*, ¶ 9.) However, on that night, the Wi-Fi was down, so Brezel had to distribute the medication manually using a paper system. (*Id.*, ¶¶ 33-35.) Bretzel would deliver medications directly to a prisoner's cell, documenting which medications were dispensed. (*Id.*, ¶ 35.)

At 9:15 p.m., Bretzel arrived at J-cell 47, which housed Delgadillo-Perez and his cellmate, Percy Simms. (ECF No. 32, ¶ 37.) Because the lights were out, Bretzel

Case 2:20-cv-00021-WED   Filed 03/16/23   Page 2 of 15   Document 71

requested they turn the lights on. (*Id.*, ¶ 38.) Bretzel readied Simms's medication, 15 mgs of Mirtazapine, and stated, "Simms medication." (*Id.*, ¶¶ 39-40). According to Delgadillo-Perez, Simms came up to the cell door and refused his medication. (ECF No. 65, ¶ 102.) Then Delgadillo-Perez approached the door. (*Id.*, ¶ 103.) Bretzel admits he was unsure which prisoner was Simms and which prisoner was Delgadillo-Perez. (ECF No. 32, ¶ 41.) Bretzel asserts that he "visually displayed the medication card to whom he believed to be Inmate Simms and verbally stated the medication and the inmate at the cell front acknowledged it was his medication by shaking his head 'yes'". (*Id.*, ¶ 43.) Delgadillo-Perez disputes that Bretzel visually displayed a medication card and says he simply gave the medication to Delgadillo-Perez. (ECF No. 65, ¶ 104.) It is undisputed, however, that Bretzel gave Simms's 15 mg of Mirtazapine to Delgadillo-Perez, who promptly took it. (ECF No. 32, ¶¶ 44-45.) After taking the medication, Delgadillo-Perez asked Bretzel what he was just given, and Bretzel showed him the medication package. (*Id.*, ¶ 46.) Delgadillo-Perez then told Bretzel that he was not Simms. (*Id.*, ¶ 47.)

The parties dispute what happened next. The defendants assert that Bretzel told Delgadillo-Perez that he would contact the Health Services Unit (HSU), and Delgadillo-Perez requested to see a nurse. (ECF No. 32, ¶¶ 49, 50.) (*Id.*, ¶ 50.) Bretzel left Delgadillo-Perez's cell and notified his supervisor, Hintz, that Delgadillo-Perez had taken the wrong medication. (*Id.*, ¶ 51.) Hintz told Bretzel to call HSU and write an incident report. (*Id.*)

Delgadillo-Perez asserts that, upon learning that he took the wrong medication, Bretzel called Hintz, who asked Delgadillo-Perez to explain what happened. (ECF No. 65,

3

¶ 49.) Hintz then asked Delgadillo-Perez if he would like to see medical staff. (*Id.*) Regardless, it is undisputed that Bretzel then called HSU. (*Id.*, ¶ 51.)

Nurse Kacyon received Bretzel's call, and Bretzel told her that Delgadillo-Perez had mistakenly taken 15 mg of Mirtazapine. (ECF No. 32, ¶ 53.) Kacyon states she reviewed the EMR to see if Mirtazapine had any contraindications with any of the medications that Delgadillo-Perez was taking. (*Id.*, ¶ 54.) Delgadillo-Perez was receiving gabapentin and Tylenol to treat "Bell's Palsy, hypertension, contracture of the upper right arm, low vitamin D, and spasm of cervical paraspinous muscle." (ECF No. 65, ¶ 101.) Kacyon asserts that she did not see any contraindications on the EMR. (ECF No. 32, ¶ 54.) Because Bretzel was unable to access the EMR in the absence of Wi-Fi, Delgadillo-Perez disputes that Kacyon was able to access the EMR. (ECF No. 65, ¶ 54.)

Hintz then escorted Kacyon to Delgadillo-Perez's cell. (ECF No. 32, ¶ 56.) At that point, both Hintz's and Bretzel's shifts were ending, so they had no additional contact with Delgadillo-Perez. (*Id.*, ¶¶ 76-77.) It is undisputed that Hintz told the incoming third shift security staff that Delgadillo-Perez took the wrong medication and that Delgadillo-Perez would notify security staff if he needed to go to the HSU. (ECF No. 65, ¶ 77.)

According to Kacyon, Delgadillo-Perez "was alert, his speech was clear, gait was steady, and his vitals were normal. He did report dizziness." (ECF No. 32, ¶ 57.) Kacyon medically assessed Delgadillo-Perez and took his vitals. (*Id.*, ¶ 58.) She cleared him to remain in his cell. (*Id.*) Kacyon states she "educated Delgadillo-Perez on what symptoms he may experience having taken Mirtazapine, such as feeling more tired and/or groggy." (*Id.*, ¶ 59.) Delgadillo-Perez disputes that Kacyon went over any symptoms with him.

(ECF No. 65, ¶ 59.) However, it is undisputed that Kacyon instructed Delgadillo-Perez how to handle his dizziness, including telling him to sit or lay down on the lower bunk. (*Id.*, ¶ 60.) She also confirmed that he had a low-bunk assignment. (*Id.*) Delgadillo-Perez told Kacyon that he was going to go to bed. (ECF No. 32, ¶ 61.) Kacyon told him to report any new or worsening symptoms to HSU by informing security staff during their nightly rounds. (*Id.*) She also told him that he would have a follow-up appointment with HSU in the morning. (*Id.*)

Kacyon determined, based on her exam, that Delgadillo-Perez did not need "any acute or immediate intervention." (ECF No. 32, ¶ 62.) According to Kacyon, the main side effects of Mirtazapine, which treats depression and anxiety, is drowsiness, and one 15 mg tablet would not cause loss of consciousness. (*Id.*, ¶¶ 64-65.) Delgadillo-Perez notes that when Mirtazapine is combined with gabapentin, a medication he was on, it "can cause increased sedation, drowsiness, dizziness, and difficulty concentrating." (ECF No. 65, ¶ 65.)

Once Kacyon completed her exam, she returned to HSU. She notes that, pursuant to the Health Insurance Portability and Accountability Act (HIPAA), she did not advise the security staff to monitor Delgadillo-Perez or watch for symptoms because she cannot discuss a patient's medical condition with a cellmate or security staff. (ECF No. 32, ¶¶ 68, 69.) However, rounds were routinely conducted every hour, and Delgadillo-Perez could ask to see HSU during those rounds. (*Id.*, ¶ 68.) Kacyon called the on-call doctor, non-defendant Dr. Hoffman, twice. (*Id.*, ¶ 72.) She left him two voicemails explaining the situation. (*Id.*) When Kacyon's shift ended, she informed her replacement, non-defendant

nurse C. Dunham, about the situation and told her to expect a call back from Dr. Hoffman. (*Id.*, ¶ 73.) Additionally, she scheduled a nurse visit for Delgadillo-Perez for the next morning, August 15, 2019. (*Id.*, ¶ 74.)

Sometime after 4:00 a.m. on August 15, 2019, Nurse Dunham received a call from security staff stating that Delgadillo-Perez "was not waking up". (ECF No. 32, ¶ 83.) Delgadillo-Perez asserts that he was in a "coma-like state." (ECF No. 1, ¶ 17.) Dunham arrived at Delgadillo-Perez's cell and found him lying on his right side. She observed that "his respiration was to be regular with rate shallow. He was observed squeezing his eyelids, but that his pupils were equal, round, and reactive to light and accommodation. His heart sounds displayed regular rate and rhythm." (ECF No. 32, ¶ 85.) Delgadillo-Perez was apparently now awake, though it is unclear from the record when he was roused and was responsive to Dunham. (*Id.*, ¶ 86.) Dunham told him that he was okay and that he would be seen later that day by HSU. (*Id.*) She also told him that he had the day off of work. (*Id.*)

At approximately 10:30 a.m. on August 15, 2019, Delgadillo-Perez was seen by non-defendant Nurse Haseleu. (ECF No. 32, ¶ 87.) Delgadillo-Perez told her that Bretzel did not show him the medication card when passing out the medication. (*Id.,* ¶ 88).) He also told her that he does not remember anything that happened after taking the wrong medication. (*Id.*) Haseleu noted that Delgadillo-Perez appeared tired and groggy. (*Id.*, ¶ 89.) She advised him to stay hydrated to flush out the remaining medication from his system and to rest. (*Id.*) Haselu also consulted with a staff psychiatrist, who determined that Delgadillo-Perez's symptoms would abate and agreed with her treatment plan. (*Id.*,

¶ 90.) There is nothing in the record to indicate that Delgadillo-Perez had any complications or further effects after his visit to the HSU.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406

7

F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Delgadillo-Perez claims that Bretzel violated his Eighth Amendment rights by giving him the wrong medication; that Hintz violated his Eighth Amendment rights by not responding appropriately to the situation; and that Kacyon violated his Eighth Amendment rights by not appropriately treating him. A prison official violates the Eighth Amendment when he is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

The parties dispute whether Delgadillo-Perez suffered an objectively serious medical condition. Delgadillo-Perez states that he slipped into a "coma-like state" and could not be woken up. The defendants acknowledge that he had difficulty waking up, but he was able to be roused. They also note that he had normal breathing and heart rhythm and he appropriately responded to stimulation. According to the defendants, at most, he was groggy the next day. However, the court does not need to determine whether Delgadillo-Perez suffered an objectively serious medical condition. Taking the facts in the light most favorable to Delgadillo-Perez, and finding that he did suffer an objectively serious medical condition, no reasonable factfinder could conclude that the defendants were deliberately indifferent to his condition.

8

To demonstrate that an official was deliberately indifferent, a plaintiff must allege "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). "[D]eliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." *Petties*, 836 F.3d at 728. "Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety." *Id.*

In support of his argument that the defendants were deliberately indifferent, Delgadillo-Perez cites to a report by a hired expert, Dr. Susan E. Lawrence. (ECF No. 64 at 8-12; ECF No. 66-4.) However, an "expert's opinion is only weakly probative of [the defendant's] mental state. By itself an expert's assessment that a treatment decision was unreasonable is not enough to establish conscious disregard of a known risk." *Zaya v. Sood*, 836 F.3d 800, 807 (7th Cir. 2016).

*Bretzel and Hintz*

Concerning Bretzel, even taking the facts in the light most favorable to Delgadillo-Perez, no reasonable factfinder could conclude that his actions constituted anything more than, at most, negligence. A plaintiff "must furnish evidence reasonably suggesting that [the defendant] knew of a serious risk of harm and consciously disregarded it." *Brown v. Cascadden*, Case No. 19-3511, 2020 WL 523083 at * 2 (7th Cir. Feb. 22, 2022). The Seventh Circuit Court of Appeals has determined that, even when a prison guard fails to

9

properly check the identity of a prisoner receiving medications and confirm the medication with the prisoner, that "might at most support a claim of negligence." *Duerson v. Hadley*, Case No. 20-3271, 2021 WL 6102170 at * 1 (7th Cir. Dec. 23, 2021).

Accepting Delgadillo-Perez's version of events, Bretzel approached the cell door and called out "Simms's medication." When Delgadillo-Perez approached the door, Bretzel did not show him the medication card but simply gave him the medication. It is undisputed that Bretzel did not know which of the prisoners in the cell was Simms. Other than an expert's opinion that this was deliberate indifference, which as explained above is insufficient without more to create a genuine question of material fact, Delgadillo-Perez presents no evidence showing that Bretzel subjectively was aware that he was giving Delgadillo-Perez the wrong medication. And even if the court were to accept the expert's opinion, at best that shows objective recklessness, which is not enough to prove a claim of deliberate indifference. *Petties*, 836 F.3d at 728. No reasonable jury could conclude that Bretzel was deliberately indifferent in administering the wrong medication.

At screening the court allowed Delgadillo-Perez to proceed on a claim against Hintz because he alleged Hintz "failed to inform the next shift of a potential problem." (ECF No. 9 at 3.) It is now undisputed that Hintz did, in fact, notify the third shift that Delgadillo-Perez was given the wrong medicine.

The parties also dispute how Bretzel and Hintz reacted to Delgadillo-Perez taking the wrong medication. But it is irrelevant whether Bretzel initially told Delgadillo-Perez

10

he would contact HSU or whether he told Hintz first. It is undisputed that, shortly thereafter, Bretzel contacted HSU.

Once HSU (specifically, Nurse Kacyon) was made aware of what had happened, Bretzel and Hintz were no longer legally obligated to take additional action. "'If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.'" *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (quoting *Spruill v. Gillis*, 372 F.3d 218, 235 (3rd Cir. 2004)). Prison officials who "stay within their roles . . . cannot be hit with damages under § 1983." *Burks v. Raemisch,* 555 F.3d 592 (7th Cir. 2009).

Because Bretzel and Hintz appropriately and promptly involved a medical professional and notified the third shift staff that Delgadillo-Perez had been given the wrong medication, no reasonable factfinder could conclude they were deliberately indifferent in handling the situation. Summary judgment will be granted in their favor.

*Nurse Kacyon*

Delgadillo-Perez claims that Nurse Kacyon was deliberately indifferent in treating him. A medical professional "who provides some treatment may still be held liable *if he possessed a sufficiently culpable mental state*." *Zaya*, 836 F.3d at 805. (Emphasis in original.) The Seventh Circuit has "emphasized the deference owed to the professional judgment of medical personnel" in such contexts *Id.* Unless the medical professional's "chosen 'course of treatment' departs radically from 'accepted professional practice', a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred." *Id.* (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir.

11

2014). As stated above, using an expert's opinion to demonstrate such a departure is only "weakly probative." *Id.* at 807. Instead, a plaintiff must provide evidence that the medical professional was aware of the risks and inappropriateness of the chosen course of treatment at the time she decided to take that course and then proceeded anyway. *Id.* Such evidence includes "affirmative evidence" of the medical professional's mental state. *Id.*

Delgadillo-Perez does not demonstrate that Kacyon had the sufficiently culpable mental state. The undisputed evidence shows that Kacyon conducted a thorough examination of Delgadillo-Perez and concluded, based on her professional experience, that he could remain in his cell until he could be brought to the HSU in the morning. Delgadillo-Perez argues that he should have been examined by a doctor. However, the mere fact that he was not examined by a doctor does not establish that Kacyon's treatment was a radical departure from acceptable treatment standards. It is undisputed that the incident occurred after hours and that no doctor was on site. It is also undisputed that Kacyon attempted to contact Dr. Hoffman twice. While the record does not indicate whether Dr. Hoffman ever returned the calls, even if he did not Kacyon cannot be held liable for Dr. Hoffman's failure to call her back. *See Burks,* 555 F.3d at 596 (Section 1983 makes public employees liable "for their own misdeeds but not for anyone else's"). Kacyon fulfilled her obligation to Delgadillo-Perez by attempting to contact Dr. Hoffman.

Delgadillo-Perez also argues that Kacyon did not specifically indicate what symptoms he should expect from taking Mirtazapine. But that does not establish

deliberate indifference. While Kacyon may not have explicitly told Delgadillo-Perez of the potential symptoms, it is undisputed that she made reasonable efforts to ensure that he was cared for. She confirmed that he would be sleeping on the lower bunk that night. She also ensured that he was aware he could contact HSU should he experience anything unusual, and she scheduled him a follow up appointment for the next morning. While she did not specifically instruct the security staff what symptoms to look out for (because she thought it was a HIPAA violation to do so), she was aware that the security staff would be conducting hourly rounds. She also informed her third shift replacement of the situation.

Delgadillo-Perez seems to argue that, had Kacyon told either him or the security staff about specific symptoms, they could have somehow prevented him from experiencing a "coma-like" state. But there is no basis for saying so. Delgadillo-Perez offers no evidence that, had Kacyon done what he says she should have done, his coma-like state could have been prevented. While a non-movant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation and conjecture will not defeat a summary judgment motion." *Herzog v. Graphic Packing Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014).

Even accepting that Delgadillo-Perez did slip into a "coma-like" state because he was not immediately seen by a doctor or because security staff was unaware of what symptoms to watch out for, he does not present evidence that he suffered any injury as a result or that his condition was worse than it otherwise would have been. But such evidence is required to successfully establish deliberate indifference. *See Gabb v. Wexford*

13

*Health Sources, Inc.*, 945 F.3d 1027, 1034 (7th Cir. 2019) (a plaintiff "must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed.") (Emphasis in original.)

Delgadillo-Perez did not establish that Kacyon was deliberately indifferent in treating him. At most, he argued that she could have taken a better course of action. But simply disagreeing with a medical professional's professional judgment as to the proper course of action "generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409. Summary judgment will be granted in Kacyon's favor.

## CONCLUSION

For the foregoing reasons the defendants' motion for summary judgment is granted. The defendants also argued that they were entitled to qualified immunity, but because the court granted summary judgment on the merits it need not address the qualified immunity arguments. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 30) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of

14

Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 16th day of March, 2023.

BY THE COURT

WILLIAM E. DUFFIN
United States Magistrate Judge